**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REGINA DIETZ, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO.: |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CHESAPEAKE PLUMBING AND HEATING, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Regina Dietz through counsel makes this Complaint against her former employer, Chesapeake Plumbing and Heating, Inc. (CPNH) for disability discrimination under the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended (ADA). CPNH cut Mrs. Dietz's bonus pay because, according to the owner of CPNH, she had gotten cancer. CPNH subjected Mrs. Dietz to a hostile work environment and constructively discharged her because of her disability. Mrs. Dietz seeks declaratory and injunctive relief, an award of compensatory and punitive damages, and an award of attorneys' fees and costs.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that this action asserts violations of rights secured by the laws of the United States.

2. Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b), as the events giving rise to the claim occurred in this District, and there is no other district in which this action may be brought.

## PARTIES

3. At all relevant times, Mrs. Dietz was an "employee" of CPNH and a resident of Worcester County, Maryland. CPNH is a full-service plumbing and heating company serving residential and commercial customers employing approximately 150 employees in Delaware and Maryland. CPNH is located at 34913 Delaware Avenue, Frankford, Delaware 19945 and is subject to service of process at its registered agent, Travis Martin, 34913 Delaware Avenue, Frankford, Delaware 19945.

## ADMINISTRATIVE PROCESS

4. Prior to bringing this action, Mrs. Dietz timely filed an administrative charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination.

5. The EEOC issued Mrs. Dietz a Notice of Right to Sue on September 6, 2018, a copy of which is attached as **Exhibit A**.

6. She files this suit within ninety (90) days of the issuance of the Notice.

7. Plaintiff has satisfied all statutory prerequisites for filing this action.

## FACTS COMMON TO ALL COUNTS

8. Mrs. Dietz began working at CPNH as an HR Generalist in November 2014.

9. The owner and Chief Executive Officer of CPNH, Travis Martin, along with Mr. Martin's then-Chief Financial Officer, Grant Pierpont, created the position of HR Generalist and hired Mrs. Dietz for the position.

10. Mr. Martin is a plumber by trade. He formed CPNH in 2003. Since 2014, CPNH has grown tremendously, ranking as one of Delaware's fastest growing companies for the last four years.

11. Mr. Martin created the position of HR Generalist to address the management of his growing workforce. Previously, those tasks had been shared between himself and Mr. Pierpont.

12. As HR Generalist, Mrs. Dietz reported directly to Mr. Martin.

13. Mr. Martin had no formal training or education in HR-related matters.

14. Prior to going to work for CPNH, Mrs. Dietz had been to school for business administration and had more than fourteen years of experience in coordinating and managing personnel at a large retailer in the area.

15. Upon assuming her position, Mrs. Dietz endeavored to make CPNH compliant with all employment laws. Mrs. Dietz set a quarterly goal for herself to prepare company-wide job descriptions that were ADA compliant and shared her goal with Mr. Martin. Mr. Martin questioned Mrs. Dietz, "What does ADA mean"? and Mrs. Dietz explained the acronym stood for the Americans with Disabilities Act. Mr. Martin then retorted, "Does that mean I have to hire plumbers in wheelchairs"? and instructed Mrs. Dietz to remove the task from her quarterly goals.

16. Mrs. Dietz also counseled Mr. Martin on appropriate questions to ask during a job interview after learning Mr. Martin was questioning applicants about their age, marital status, and whether they had children. Mr. Martin refused to heed Mrs. Dietz's instructions and continued to ask illegal questions of applicants.

17. At one point, Mr. Martin instructed Mrs. Dietz that he planned to hire only "millennials" because they "learned faster." Mr. Martin had attended a conference about millennials in the workplace and ordered his new Chief Financial Officer, Deborah Chaney, who had previously served as his administrative assistant, to tell Mrs. Dietz the plan. When Mrs. Dietz questioned the legality of the instruction, Ms. Chaney told her to address the matter with Mr. Martin directly. When confronted, Mr. Martin denied giving the instruction.

18. It soon became apparent to Mrs. Dietz that, although she had been hired by Mr. Martin as an HR Generalist, Mr. Martin wanted her to focus on processing paperwork for new hires and handling payroll. Mr. Martin deterred Mrs. Dietz from taking any action that would bring CPNH in compliance with employment laws.

19. Mrs. Dietz heeded Mr. Martin's instructions and did what was asked of her.

20. On March 22, 2016, approximately a year and a half after going to work for CPNH, Mrs. Dietz was diagnosed with breast cancer. On that day, she received a call at work from the doctor's office informing her of the diagnosis.

21. Ms. Dietz became visibly upset and shared the news with Ms. Chaney. Mrs. Dietz left work early that day and, on her way home, called Mr. Martin to inform him of the news.

22. Ms. Dietz's breast cancer was advanced and considered "Stage 3," which meant the cancer extended beyond the immediate region of the tumor and had invaded nearby lymph nodes.

23. Mrs. Dietz started aggressive chemotherapy on April 22, 2016 to help shrink the tumor prior to her scheduled double mastectomy.

24. While Mrs. Dietz underwent chemotherapy, she continued to work taking off Fridays to receive treatment and occasionally on Mondays because of the chemotherapy side effects.

25. Given her background, Mrs. Dietz knew she was eligible for leave under the Family Medical Leave Act ("FMLA") and, without being asked, submitted a completed FMLA leave application to Ms. Chaney and Mr. Martin.

26. Mr. Martin confessed he did not know what "FMLA leave" was, but granted Mrs. Dietz the time off from work that she needed to fight her cancer.

27. On October 7, 2016, Mrs. Dietz had a bilateral mastectomy. She was out of work for close to four weeks for the surgery.

28. Although Mrs. Dietz was absent from work, to the extent she could, she continued to manage payroll-related issues at CPNH.

29. Mrs. Dietz returned to work fulltime without restrictions in early November 2016.

30. Approximately three to four days after returning to work, Mrs. Dietz presented to the local Emergency Room very ill. She was transferred and admitted to the Intensive Care Unit at Johns Hopkins Hospital, and was diagnosed with sepsis caused by an infected tissue expander.

31. Mrs. Dietz recovered quickly and was discharged on November 15, 2016. Two weeks later, Mrs. Dietz returned to work fulltime.

32. For the next few months, Mrs. Dietz underwent thirty-three radiation treatments while working. Mrs. Dietz used her lunch hour to attend those treatments.

33. By February 2017, Mrs. Dietz had concluded her cancer treatment and was told by her physician there was "no evidence of disease."

34. After concluding her cancer treatment, Mrs. Dietz missed few days from work until she had breast reconstructive surgery on September 13, 2017 and was out of work for approximately two weeks.

35. Mrs. Dietz returned to work from the reconstructive surgery fulltime without restrictions.

36. By late fall 2017, Mrs. Dietz was working overtime.

37. As the holidays approached, Mr. Martin charged Mrs. Dietz with planning CPNH's holiday party, which was to be held Friday, December 15 at a hotel in Ocean City, Maryland.

38. On the afternoon of the holiday party, Mr. Martin asked Mrs. Dietz to cut every employee a bonus check so that he could distribute them at the party that evening.

39. Because of a mistake made by Mr. Martin, Mrs. Dietz had to redo all the bonus checks with the result that she had to stay at work late with Mr. Martin.

40. As Mr. Martin dictated the amount each employee was to receive, Mrs. Dietz cut the check.

41. Mr. Martin gave several plumbing supervisors and employees on the "leadership team" a $15,000 bonus.

42. Mr. Martin then instructed Mrs. Dietz to issue herself a bonus check for $2,700, which was $1,300 less than the bonus she had earned the year prior.

43. Surprised her bonus had been cut without explanation, Mrs. Dietz asked Mr. Martin, "What can I do to get a bigger bonus?"

44. Mr. Martin bluntly responded, "Don't have cancer, Reggie."

45. Shocked and offended, Mrs. Dietz replied, "To God's ears Travis, do you think I wanted this?"

46. Mr. Martin did not respond, nor did he apologize.

47. The two then continued to work in silence until Mrs. Dietz finished completing everything Mr. Martin had asked of her.

48. Once at home that evening, Mrs. Dietz shared with her husband that Mr. Martin had cut her bonus, according to him, because she had cancer.

49. Despite her mistreatment by Mr. Martin, Mrs. Dietz decided to attend CPNH's holiday party. Mrs. Dietz had spent a great deal of time planning the party and wanted to enjoy

the evening with her office co-workers, who had been extremely supportive of her while she battled cancer.

50. When Mrs. Dietz and her husband arrived to the party, they put down their belongings and approached Mr. Martin, who was handing out bonus checks to the front of the room.

51. Mr. Dietz attempted to address the offensive comment Mr. Martin had made to his wife earlier that day.

52. Mr. Martin did not want to discuss the matter at the party and ordered Mr. Dietz to leave.

53. Mr. Dietz complied and Mrs. Dietz left with him.

54. Although they left the party, Mrs. Dietz and her husband stayed at the hotel to have dinner in one of its restaurants.

55. It did not take long for all of Mrs. Dietz's co-workers to learn of Mr. Martin's offensive remark and to learn he had kicked Mr. Dietz out of the holiday party. As a result of the recriminations that were being lodged against him, Mr. Martin called Mr. Dietz on his cell phone to apologize.

56. Mr. Dietz received the call while he was eating dinner with his wife at the hotel restaurant.

57. According to Mr. Dietz, Mr. Martin apologized for kicking him out of the party; Mr. Martin did not apologize for making the offensive remark to Mrs. Dietz or for cutting her bonus, because, according to Mr. Martin, she had gotten cancer.

58. At no point during his telephone conversation with Mr. Dietz did Mr. Martin offer to apologize to Mrs. Dietz.

59. During the course of the telephone conversation with Mr. Dietz, Mr. Martin learned that the Dietz's were having dinner in the hotel restaurant. Mr. Martin asked if he could meet them at their table. They agreed.

60. When Mr. Martin arrived at the Dietz's table, he looked directly at Mr. Dietz and apologized for kicking him out of the party and for refusing to talk to him about the situation.

61. After speaking to Mr. Dietz, Mr. Martin then turned to look at Mrs. Dietz and said, "I am sorry to you too." This was the first time Mr. Martin apologized to Mrs. Dietz.

62. Mr. Martin then paid for the Dietz's dinner and invited them to return to the party.

63. Mr. and Mrs. Dietz accepted the invitation and returned to the party, but had no further interaction with Mr. Martin.

64. Mr. Martin did not give Mrs. Dietz her bonus check at the party. (All other employees got their bonus checks).

65. On Monday, December 18, 2017, shortly after arriving to work, Mrs. Dietz was called into a meeting with Mr. Martin and Ms. Chaney and reprimanded for asking Mr. Martin what she needed to do to get a bigger bonus.

66. Mr. Martin accused Mrs. Dietz of improperly using her position as HR Generalist to compare her bonus to other employees' bonuses.

67. Mrs. Dietz denied the allegation and told Mr. Martin her question was based on the fact he had cut her bonus from the year prior by a third without explanation.

68. Mrs. Dietz pointed out that Mr. Martin had never communicated her performance had been lacking.

69. In response, Mr. Martin claimed she had unspecified "performance issues" over the last year, (although there was nothing in her file to justify such a claim).

70. When Mrs. Dietz pressed Mr. Martin for examples of her "performance issues," Mr. Martin told her she was "not mentally prepared to hear" how she could improve.

71. Further offended, Mrs. Dietz pushed Mr. Martin to explain and he claimed Mrs. Dietz needed to be "more impartial." Although Mr. Martin did not elaborate, Mrs. Dietz believed Mr. Martin was referring to an incident that had occurred earlier that year involving another employee. That particular employee had requested a meeting with Mr. Martin and Ms. Chaney to ask for help, and had asked Mrs. Dietz to attend the meeting as a witness in her capacity as HR Generalist. Mr. Martin was not able to attend the meeting; consequently, the meeting took place with only Ms. Chaney and Mrs. Dietz. At the meeting, the employee conveyed he was working at night and on weekends to try to keep up with his overwhelming workload, particularly after taking off time from work to transport his wife to medical appointments in Baltimore. The employee asked for additional assistance. During the course of the meeting, Mrs. Dietz agreed with the employee that additional help was needed. After the meeting, Mr. Martin and Mrs. Chaney faulted Mrs. Dietz for being emotional during the meeting, advocating for the employee, and failing to guard the company.

72. After being reprimanded and falsely accused of unspecified "performance issues," Mr. Martin asked Mrs. Dietz if she "forgave him," apparently referring to his hasty apology at dinner the night of the holiday party.

73. Mrs. Dietz told Mr. Martin she had forgiven him, but said she would not be able to forget what Mr. Martin had said and what had since transpired.

74. Mr. Martin asked how they could move forward. Mrs. Dietz turned the question back upon Mr. Martin, who confessed, he "didn't know."

75. Before the meeting concluded, Mrs. Dietz had to ask Mr. Martin for her bonus check, which he had still not given to her. Mr. Martin sarcastically responded, "Oh, you didn't get your check; let me get your check."

76. Mr. Martin gave Mrs. Dietz her bonus check and the meeting concluded at roughly 9:30 in the morning.

77. In light of Mr. Martin's conduct at the meeting it became clear to Mrs. Dietz that she could either continue to submit to intolerable harassment by an unrepentant boss or leave. Mrs. Dietz reasonably feared that, if she continued to work for CPNH, Mr. Martin would interpret it as permission for him to continue mistreating her. Consequently, Mrs. Dietz returned to her office to begin wrapping up matters to leave.

78. At roughly 12:00 p.m., Mrs. Dietz left for lunch. When she returned, Mrs. Dietz called Ms. Chaney to tell her she was leaving, so they could spend the afternoon working on a transition plan.

79. Mrs. Chaney did not answer her phone, so Mrs. Dietz related her message via text in accordance with their standard practice of communicating in the office.

80. Shortly thereafter, Ms. Chaney met Mrs. Dietz in her office and Mrs. Dietz began to walk Ms. Chaney through everything. As she did so, Mr. Martin entered Mrs. Dietz's office and wished Mrs. Dietz "good luck."

81. Apparently, Ms. Chaney had told Mr. Martin that Mrs. Dietz was leaving before coming up to meet Mrs. Dietz in her office. Neither Ms. Chaney nor Mr. Martin asked Mrs. Dietz not to leave or offered to fix the problem.

82. Following Mrs. Dietz's departure, Mr. Martin attempted to smear Mrs. Dietz by telling the other CPNH employees Mrs. Dietz had quit because she wanted more money and she would not forgive him, all of which was false.

83. In harassing and constructively discharging Mrs. Dietz, Mr. Martin acted with malice and a reckless indifference to Mrs. Dietz's federally protected rights.

84. As a result of CPNH's misconduct, Mrs. Dietz has suffered and will continue to suffer the loss of a career and the loss of a salary, benefits, bonuses, and other compensation.

85. Mrs. Dietz has also suffered and will continue to suffer non-pecuniary losses, including, but not limited to, emotional pain and suffering, humiliation, and embarrassment, all of which have been accompanied by physical symptoms.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

## COUNT I
## DISABILITY DISCRIMINATION UNDER ADA – PAY CUT

86. Mrs. Dietz incorporates the facts alleged above.

87. Mrs. Dietz was disabled within the meaning of the ADA; she had a physical impairment that substantially limited one or more major life activities.

88. At the time Mr. Martin cut Mrs. Dietz's bonus by one-third, she was qualified to perform the essential functions of her job with or without reasonable accommodations.

89. By Mr. Martin's own admission, he cut Mrs. Dietz's bonus by a third because she had cancer.

## COUNT II
## DISABILITY DISCRIMINATION UNDER ADA – HARASSMENT

90. Mrs. Dietz incorporates the facts alleged in paragraphs above.

91. Mr. Martin did not comply with the ADA and openly disregarded the law. Aside from instructing Mrs. Dietz to not make CPNH's job descriptions ADA compliant, he cut Mrs. Dietz's bonus because, according to Mr. Martin, Mrs. Dietz had gotten cancer. After taking this discriminatory action, Mr. Martin reprimanded Mrs. Dietz for asking what she needed to do to get a bigger bonus and falsely accused Mrs. Dietz of unspecified "performance issues." When Mrs. Dietz pressed Mr. Martin for examples of her "performance issues," Mr. Martin told Mrs. Dietz she needed to be "more impartial," referring to an incident when Mrs. Dietz advocated for a CPNH employee and, according to Mr. Martin, did not "guard the company."

92. Mr. Martin's harassment of Mrs. Dietz was severe and altered the conditions of her employment. Following the December 18 meeting, Mrs. Dietz's options were to continue to submit to Mr. Martin's intolerable harassment or leave.

## COUNT III
## DISABILITY DISCRIMINAITON UNDER ADA – CONSTRUCTIVE DISCHARGE

93. Mrs. Dietz incorporates the facts alleged in paragraphs 1-92 above.

94. CPNH, through its owner and CEO Mr. Martin, constructively discharged Mrs. Dietz by knowingly harassing and discriminating against Mrs. Dietz on the basis of her disability to the point it became intolerable and Mrs. Dietz resigned.

95. A reasonable person in Mrs. Dietz's position would have also felt compelled to resign.

## PRAYER FOR RELIEF

**WHEREFORE,** Mrs. Dietz respectfully requests this Honorable Court grant the following relief:

    A.    Enter a judgment in favor of Mrs. Dietz and against CPNH for compensatory damages;

    B.    Enter a judgment in favor of Mrs. Dietz and against CPNH for punitive damages;

    C.    Enter a declaratory judgment holding that CPNH violated Mrs. Dietz's rights under the laws of the United States;

    D.    Enter an injunction compelling CPNH to reinstate Mrs. Dietz and prohibiting CPNH from further discrimination and/or retaliation, or, in the alternative, compelling CPNH to pay Mrs. Dietz front-pay;

    E.    Assess reasonable attorneys' fees and costs of suit in favor of Mrs. Dietz and against CPNH; and

    F.    Grant Mrs. Dietz such other and further relief as the nature of her cause may warrant.

**ALLEN & ASSOCIATES**

/s/ *Michele D. Allen*
Michele D. Allen (#4359)
Caitlyn E. Quinn (#6319)
724 Yorklyn Road, Suite 310
Hockessin, Delaware 19707
(302) 234-8600
(302) 234-8602 (Fax)
michele@allenlaborlaw.com
*Attorneys for Plaintiff*

**Of Counsel**

Robin R. Cockey, *Pro Hac Vice* pending
Ashley A. Bosché, *Pro Hac Vice* pending
Cockey, Brennan & Maloney, P.C.
313 Lemmon Hill Lane
Salisbury, Maryland 21801
Telephone:  (410) 546-1750
Facsimile:  (410) 546-1811
rrcesq@cbmlawfirm.com

Dated:  November 28, 2018

14